UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA        :

         v.        :        23-cr-36-JRT

KASSIUS ORLANDO BENSON        :

**DEFENDANT'S RESPONSE TO GOVERNMENT'S SENTENCING POSITION**

    Kassius Benson, through counsel, respectfully responds to the Government's Sentencing Position with Respect to Sentencing (ECF 56) and replies to the Government's Response to Defendant's Sentencing Position (ECF 60). In doing Mr. Benson focuses his response in two areas. *First*, the government misapprehends the financial expenses and burdens associated with Mr. Benson's law firm and extrapolates from its error that Mr. Benson's failure to pay-over taxes was motivated by personal financial enrichment. To the contrary, by expanding his law firm beyond a sole proprietorship, he overextended himself beyond his capacity and used high-interest credit card charges and loans to support the business. As was clear from his initial submission (ECF 57), Mr. Benson does not offer his failings as an excuse for the conduct that brings him before the Court. But it is relevant context to understand that conduct. *Second*, the government presents an inaccurate and incomplete recitation of sentences in failure-to-pay-over cases, neglecting to observe that Mr. Benson's guidelines are lower than the universe of prior cases and omitting at least five cases in this district alone in which the Court imposed a probationary sentence for a defendant with higher guidelines that Mr. Benson.

1

**A. Mr. Benson's failure to pay-over taxes resulted in part from poor business management.**

The government appears to view Mr. Benson's law practice as flourishing economically, suggesting that payments to personal credits cards were unrelated to business expenses, that cash withdrawals from his personal accounts were all for personal reasons, and that his firm operated without business debt. *See* ECF 56 at 10-12. It is mistaken. Mr. Benson, who was solely responsible for running the law firm, used personal credit cards and withdrew cash from his personal accounts to fund the business and keep it going when revenue fell short. While not optimal op business practices, they were what Mr. Benson did when he needed to pay expenses and keep the law office going. His repayment of credit cards was necessary to keep funds available for the payment of salaries and other expenses. During the period from 2016–2019, Mr. Benson paid $643,333 in salaries and compensation.[1] During the same period, Mr. Benson paid $231,265 in rent for office space.[2] Mr. Benson also was responsible for and paid the costs and expenses of preparing and trying multiple homicide and other major criminal cases – primarily serious public defender cases in the northern part of the state that he took on contract for a flat fee that did not compensate for the expenses of the cases.[3] For those low-paying public defender cases, the expenses included (and were not limited to) hotel rooms for Mr. Benson and any associates that he brought to train and try the cases with

---

[1] Salaries and compensation: 2016 - $173,461; 2017 - $153,125; 2018 - $170,042; and 2019 – $146,705. *See* 1120S Tax Returns.

[2] Rents: 2016 - $47,856; 2017 – $54,600; 2018 - $57,600; and 2019 - $71,049. *See* 1120S Tax Returns.

[3] *See, e.g.*, Letter of Chief Public Defender Kris Kolar at 2, provided in Exhibit 9 to ECF 57.

him. The salaries, rents, and case expenses are only a snap shot of the day-to-day expenses for which Mr. Benson was responsible while running the firm.

The government criticizes Mr. Benson for not taking out loans to support his business and argues that he has no debt from the business. *See* ECF 56 at 12. These criticisms rest on a faulty premise. Mr. Benson put a range of business expenses on personal credit cards, which then created an increasingly heavy financial burden of paying down those cards. Indeed, Mr. Benson still has such debt as reflected in his Wells Fargo card listed in his credit report. See ECF 54 (PSR) at 12, ¶ 57. Additionally, between December 2015 and May 2018, Mr. Benson took out working capital business loans at unfavorable terms from PayPal in the amount of $94,377, with a total of PayPal operating loans in the amount of $108,500. The accrual of this debt diminished as the expense of employee salaries diminished. Nonetheless, of those amounts, $42,783.18 remains due.[4]

In addition to paying business salaries, rent, and other operating expenses, Mr. Benson ensured that essential personal expenses – like child support and family living expenses – were paid. This attention is not an excuse for failing to satisfy his obligations to the IRS, but it is relevant because it distinguishes his case from those in which the delinquent taxpayer instead spent money on an array of fancy vacations, luxury items, and frivolous pursuits. The government faults Mr. Benson for buying a used Dodge Ram truck (while travelling across the state to maintain his law practice) and continuing to live in a four-bedroom family home (that he shares with his two youngest daughters who live in the greater Minneapolis area and whom he co-parents and that provides a private bedroom for his older daughter when she visits), when a Zillow search in 2024 shows

---

[4] A computer printout reflecting an outstanding loan balance of $42,783.18 is attached as **Exhibit A**.

3

other, cheaper options. *See* ECF 56 at 13-14. Mr. Benson has done what he can to maintain some semblance of continuity for his children while he winds down his practice and resolves the matter that brings him before the Court for sentencing.

The government posits that Mr. Benson's October 2020 personal return reflects a decision to perjure himself, contrary to "the honorable and integrous person he presents himself to be." ECF 56 at 6. As an initial matter, nowhere in Mr. Benson's letter to the Court does he present himself as "honorable" or laud his own personal integrity. He is a humbled man who acknowledges the grave errors he has made and still is coming to full terms with the personal and profession al damage that he has inflicted upon himself and his family.[5]

The personal return Mr. Benson filed in October 2020 carried forward inaccurate information contained in the corresponding business return, which was filed in June 2019, before he learned of the audit. His personal return is the action of a man who was in denial about the severity of his mistakes and had not yet identified a path out of the hole that he dug. But he did find that path, which led him to the entry of a guilty plea and sentencing for a felony offense. Ideally, Mr. Benson would have found the path to correction earlier and rectified his mistakes before a felony indictment: if he had done so had would not be facing the stigma of a criminal conviction, the potential loss of his bar license, and the shame of standing before the Court as a defendant rather than as defense

---

[5] The government's statement that Mr. Benson "[told] the legal community and the community at large: I am fit to be an example for you to follow," ECF 56 at 8, is inaccurate. As the letters to the Court demonstrate, Mr. Benson is throughout his career a lawyer who puts his clients first and does not seek publicity or acclaim for his work. He recognizes that as the first Black head of the Hennepin County Public Defender, he was viewed by some as a role model and he is ashamed to have failed to live up that standard. But the government's running caricature of Mr. Benson in its sentencing position and response is untrue – and intemperate.

4

counsel. The rhetoric that a probationary sentence would lead anyone to think "I guess I have nothing to fear except some attorney fees," ECF 56 at 9, ignores reality.

Frankly, the fact that Mr. Benson applied for the job as Chief of the Hennepin Public Defender Office after learning of the civil audit further shows his inability to sufficiently grapple with the severity of the situation in which he found himself. Those who hired Mr. Benson and worked under Mr. Benson's managerial leadership and supervision at the office roundly praise his transformation of the office, and Mr. Benson takes great pride about that work. *See, e.g.*, Exhibit 14 to ECF-57 (Letter of William Ward, Minnesota Public Defender); *see also* Exhibits 9 and 13 to ECF-57 (collecting letters from public defender colleagues and hires of Mr. Benson). That pride is matched by the embarrassment and remorse regarding his resignation from the Chief position, both because of the adverse attention it brought to the Office and because it prevented him from accomplishing more. The idea that he would have knowingly put the Office at reputational risk or obtain a position for which he was unfit, *see* ECF 60 at 4-5, ignores Mr. Benson's history with that Office and career as a public defender.

Despite that business costs and expenses were overwhelming at times, Mr. Benson ensured that the firm employees received their paychecks every pay period. Mr. Benson has acknowledged that he is criminally responsible for not collecting and handing over taxes to the federal government. He accepts full responsibility for that fault. However, the law firm was not a personal slush fund for Mr. Benson. It was a source of pride for him as far as the scope and quality of work that it provided to clients and the community. At the same time, the firm, over-expanded without sufficient income generation and

mismanaged by its owner and lead trial lawyer, also served as an albatross of a financial burden.

### B. A probation sentence is sufficient but no greater than necessary and avoids unwarranted disparities with other § 7202 cases.

The government supports its request of an imprisonment sentence for Mr. Benson by citing law that has since been abrogated and supplying the results of *some* sentences in other tax violation cases in a misleading, incomplete fashion that fails to observe the vast differences in the sentencing guidelines in those cases and in Mr. Benson's case and that fails to include many other similar cases that resulted in probation sentences. *See* ECF 56, at 3, 4, 9-10.

The government cited some Eighth Circuit decisions to support its request of a prison sentence, while failing to report that the reasoning of the cases was long-ago abrogated. For example, the government cites to *United States v. Ture*, 450 F.3d 352 (8th Cir. 2006) *United States v. Carlson*, 498 F.3d 761 (8th Cir. 2007), and *United States v. Soperla*, 494 F.3d 752 (8th Cir. 2007)[6] as cases in which the Eighth Circuit held that the district court abused its discretion and remanded for re-sentencing when the district court varied downward from a guidelines range of imprisonment to impose probation sentences. Yet, the guidelines are voluntary, not mandatory. And the government is just wrong when it argues that "extraordinary justification" is needed for a downward variance to probation when the guidelines reflect an incarceration range. Shortly after *Ture* and *Carlson*, the U.S. Supreme Court reminded that U.S. District Courts are vested with broad discretion

---

[6] The government's citation to *Soperla*, which incorporates the Court of Appeals docket number, appears to be lifted from the body of the subsequent *Carlson* decision. *See* 498 F.3d at 761.

in sentencing in *Gall v. United States*, 552 U.S. 38 (2007). District courts and the lawyers who appear before them have followed that directive ever since.

Left unsaid and unaddressed by the government is that, in any event, given Mr. Benson's criminal history and offense level, a probationary sentence *is* supported by the guidelines. To be sure, as of November 1, 2023 amendment, the guidelines *encourage* a probationary sentence for Mr. Benson's offense. *See* U.S.S.G. § 5C1.1, Note 10 ("If the defendant received an adjustment under § 4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3) is generally appropriate. *See* 28 U.S.C. § 994(j)."), *cited at* ECF 54 (PSR) at 14, ¶ 63; *see also* U.S.S.G. §, 5C1.1, Application Note 4 ("If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment.").

Nonetheless, the government provides a Quick Facts for Tax Fraud Offenses handout to support its request for a prison sentence. *See* ECF 56 at 4. Ignored by the government is that the handout expressly does not reflect sentences for Mr. Benson's offense. *Compare* ECF 56-1 at 2 "("Tax fraud offenses include cases in which the offender was sentenced under § 2T1.4….") *with* ECF 54 (PSR) at 1, ¶ 3 (sentencing is under § 2T1.6). Nor does the handout reflect offense levels. In any event, the handout, which reflects that 40% of the sentences did not involve incarceration, 58% of sentences involved downward variances, and that the average sentence imposed has been decreasing over time, ECF-56-1 at 2, further supports probation here.

7

For more pertinent information, defense counsel ran JSIN searches to provide the Court with national aggregate sentencing data over the past five years. This data reveals that, even without accounting for the November 1, 2023 amendments to the guidelines, the presumptive national sentence for Mr. Benson's offense is probation.

Counsel ran JSIN searches for § 2T1.6 for Mr. Benson's cell (CH I, Offense Level 11) and for nearby cells (CH I, Offense Levels, 9, 10, 11, 12, and 13). There is insufficient data for the cells for levels 9-12. For Level 13 (which is two levels above Mr. Benson, in Zone C, and has a GL of 12-18 months), 15/25 defendants received probation (60%). Defense counsel also ran JSIN searches for 2T1.4 for Mr. Benson's cell (CH I, Offense Level 11) and for nearby cells (CH 1, Offense Levels 9, 10, and 12). There was insufficient data for cells 9 and 11. For level 12 (which is above Mr. Benson), 7/10 defendants received sentences of probation. For level 10, 2/5 defendants received sentences of probation. The facts of the other three cases are unknown. Thus, for a combination of levels 10 and 12, 9/15 or 60% received probation. The JSIN data supports a probationary sentence for Mr. Benson's Zone B, Criminal History Category I, Offense Level 11 offense.

The government also provides a table detailing 23 cases within this district. *See* ECF56-B, giving the impression in its brief that the table is "complete" and comprehensive. *See* ECF 56 at 4 & n.4. Nonetheless, the government's chart is neither complete nor comprehensive. To start, it is incomplete because it omits the criminal history categories, offense levels, and guideline ranges for each of the defendants included in the cart. Respectfully, it is unhelpful to compare Mr. Benson's case to cases with higher guidelines ranges, without recognizing and accounting for the difference in

ranges. Defense counsel therefore has created a chart, entitled Government's Exhibit B Table – Complete" that includes the necessary relevant information for the 23 cases that the government included in its table. This chart is attached as **Exhibit B**. As one would expect, the vast majority of those cases had much higher guidelines than does Mr. Benson. Recall that Mr. Benson's guidelines are 8-14 months. With two exceptions, those cases with guidelines in which the bottom number was less than 20 months *all* resulted in probationary sentences. *E.g.*, Annette Jones (18-24 months); Gary Hedin (12-18 months); Erick Okeson (10-16 months); Michelle Udon (18-24 months); Barry Voss (12-18 months). The exceptions are Mohamed Abdi, who received a time-served sentence and supervised release and Shawn and Dana Orr, who each received some incarceration time for their very litigious 2006 cases in which they were sentenced in 2008.[7]

In addition to being incomplete, the government's chart is also not comprehensive, excluding many cases in the district in which probation sentence were given for higher offense-level § 7202 conduct. By reviewing ECF for the district, defense counsel identified ten § 7202 cases in which a judge of this Court varied downward and imposed a sentence of probation instead of incarceration. *See* ECF 57 at 17-18. Some of those cases are included in the government's chart. But a number of others not: *United States v. Nguyen*, 11-cr-237-DSD (Mar. 11, 2013) (with loss amount of $288,387 and advisory guidelines of 18-24 months, imposing sentence of five years of probation);

---

[7] The *Orr* case is *sui generis* because they entered their guilty pleas only after their significant pretrial litigation, their granted request for a continued trial date, and their pleas eventually on the eve of the trial date. *See*, *e.g.*, *United States v. Shawn and Dana Orr*, 06-cr-249-PJS, ECF 202 & 203 (Orr change of plea hearings on March 25, 2008); ECF 194 (continuing trial to April 14, 2008); ECF 187 (November 8, 2007 Orr motion to continue); ECF 169-71 (August 3, 2007 Magistrate's Report and Recommendations multiple Orr substantive motions); ECF 136 (February 14, 200y setting of trial for June 18, 2007).

9

*United States v. Clough*, 12-cr-109-RHK (Sept. 10, 2012) (with loss amount of $944,134 and advisory guidelines of 24-30 months, imposing sentence of three years of probation); *United States v. Kopel*, 10-cr-29-MJD (Jan. 27, 2011) (with loss amount of $627,427 and advisory guidelines of 25-30 months, imposing sentence of three years of probation, with six months in a residential re-entry center and six months on home detention); *United States v. Schwarz*, 07-cr-308-JRT (Apr. 29, 2008) (with loss amount of "almost $200,000" and advisory guidelines of 12-18 months, plus existence of false statements by defendant, imposing sentence of five years of probation).

The government's compendium of cases even falters as it relates to the Eighth Circuit decisions that it cites. On remand in *Carlson*, which had a guidelines range of 18-24 months, the district court entered an agreed joint sentencing recommendation by the parties. Given that the government indicated that it would appeal (again) any sentence that did not include some amount and form of incarceration, the defendant in *Carlson* agreed to five months of work release with community service while on supervised release rather than protract his legal proceedings. The Court endorsed the joint sentencing recommendation. *See* ECF 25, Amended Sentencing Judgment, *United States v. Richard L. Carlson*, 06-cr-47-JRT (May 8, 2008); ECF 26, Joint Sentencing Recommendation of the Parties, *United States v. Richard L. Carlson*, 06-cr-47-JRT (May 8, 2008). In *Ture*, which had a guidelines range of 12-18 months, upon a contested sentencing remand, the Court resentenced the defendant again to probation with community service. *See* ECF 32, Amended Sentencing Judgment, *United States v. Gerald Ture*, 04-95-JRT (Apr. 29, 2008).

10

In short, prior sentences in this district (and nationally) merit a probationary sentence for Mr. Benson.

### C.  Mr. Benson has deep community support.

After the initial sentencing submission, counsel received a letter in support from attorney Tracie Olson. Ms. Olson's letter is **Exhibit C** and is filed under seal.

## CONCLUSION

Probation, with community service and other attendant conditions and consequences of the conviction, is appropriate. A jail sentence is excessive, serves no valid purpose, and is greater than necessary. Counsel reserves the right to make additional requests at the time of the sentencing hearing.

Dated: May 1, 2024                             Respectfully submitted,

By:        /s/ Edward J. Ungvarsky
Edward J. Ungvarsky
D.C. Bar # 459034
*Adm. Pro Hac Vice* to U.S. District Court for MN
UNGVARSKY LAW, PLLC
421 King Street, Suite 505
Alexandria, VA 22314
Telephone: (571) 207-9710
Mobile: (202) 409-2084
Email address: ed@unvarskylaw.com

By:        /s/ Andrew T. Wise
Andrew T. Wise
D.C. Bar # 456865
*Adm. Pro Hac Vice* to U.S. District Court for MN
MILLER & CHEVALIER CHTD
900 16th St. NW
Washington, D.C. 20006
Telephone: (202) 626-5818
Mobile: (202) 744-4943
Email address: awise@milchev.com

By:        /s/ Daniel S. Adkins
Daniel S. Adkins, Esquire
Attorney License No. 266085
North Star Law Group
413 N Wacouta Street, Suite 500
Saint Paul, MN 55101
Telephone: 651-330-9678
Email: dan@northstarcriminaldefense.com

**CERTIFICATE OF SERVICE**

    I hereby certify that on the 1st day of May, 2024, I electronically filed a true copy of the foregoing memorandum with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties.

                                                  /s/
                                     Edward J. Ungvarsky, Esquire